Charles E. BOZWICH, Appellee,

v.

David MATHEWS, Secretary of Health, Education and Welfare, Appellant.

No. 76–1869.

United States Court of Appeals, Eighth Circuit.

Submitted March 16, 1977.

Decided July 13, 1977.

Andrew E. Wakshul, Social Security Div., Dept. of H. E. W., Baltimore, Md., for appellant; Rex E. Lee, Asst. Atty. Gen., Washington, D. C., George H. Perry, U. S. Atty., John Fitzgibbons, Asst. U. S. Atty., Des Moines, Iowa, on the brief.

Paul F. Christoffers, Chariton, Iowa, for appellee.

Before GIBSON, Chief Judge, and WEBSTER and HENLEY, Circuit Judges.

WEBSTER, Circuit Judge.

The Secretary of Health, Education and Welfare appeals from the order of the District Court [1] granting summary judgment in favor of Charles E. Bozwich on his petition for review of the Secretary's decision that he was not entitled to disability benefits under Part B of the Federal Coal Mine Health and Safety Act of 1969, *as amended,* 30 U.S.C. §§ 921–925. We affirm the District Court.

In 1969, Congress passed the Federal Coal Mine Health and Safety Act of 1969, Pub.L. 91–173, 83 Stat. 742. The Act established health and safety standards for coal mines, and also established a system of compensation for miners who were disabled as a result of pneumoconiosis ("black lung").[2] The statutory provisions regarding pneumoconiosis were significantly amended by the passage of the Black Lung Benefits Act of 1972, Pub.L. 92–303, 86 Stat. 150. Detailed regulations have been promulgated to implement the Act. 20 C.F.R. §§ 410.-101–.699.

In order to qualify for benefits under the amended Act, a miner must establish total disability due to pneumoconiosis. 30 U.S.C. § 921(a). Under the applicable statutes and regulations, a miner who filed a claim for benefits by June 30, 1973, may qualify for benefits in two different ways.

First, a miner may present medical evidence which will qualify him under the "interim criteria" promulgated by the Secretary. 20 C.F.R. § 410.490. Under this section a miner with the requisite underground experience can raise a rebuttable presumption of total disability due to pneumoconiosis by two methods. He may raise the presumption by establishing the existence of simple pneumoconiosis by chest X-

---

1. The Honorable William C. Hanson, Chief United States District Judge for the Southern District of Iowa.

2. According to the Surgeon General of the United States, pneumoconiosis is a chronic chest disease, caused by the accumulation of fine coal dust particles in the human lung. The disease may be classified as "simple" or "complicated," depending upon the extent of opacities reflected in a chest X-ray.

   "Simple" pneumoconiosis seldom produces significant ventilatory impairment, but the pinpoint type may reduce the diffusing capacity— *i. e.,* the ability to transfer oxygen from the lung into the blood.

   "Complicated" pneumoconiosis is, as the name suggests, a more serious form of the disease. A miner afflicted with complicated pneumoconiosis incurs progressive massive fibrosis as a complex reaction to dust and other factors, which may include tuberculosis and other infections. The disease produces marked pulmonary impairment and considerable respiratory disability. Such disability severely limits the patient's physical capabilities, can induce death by cardiac failure, and may contribute to other causes of death.

   There is no specific therapy for pneumoconiosis in either its simple or complicated form.

   *See* S.Rep.No.743, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 2305, 2309–10.

ray, biopsy, or autopsy, 20 C.F.R. § 410.-490(b)(1)(i), or by establishing the presence of a chronic respiratory or pulmonary disease by demonstrating ventilatory capacity levels equal to or less than values specified in an interim table. 20 C.F.R. § 410.-490(b)(1)(ii) and (b)(3).

Second, a miner who is unable to establish total disability due to pneumoconiosis under the interim criteria may nonetheless qualify under the "permanent criteria." 20 C.F.R. § 410.490(e). Again, there are alternative methods which may be used. A miner may establish that he is totally disabled due to pneumoconiosis by showing X-ray, biopsy, or autopsy evidence of the existence of pneumoconiosis.[3] 20 C.F.R. § 410.414(a). Alternatively, a miner may raise a rebuttable presumption of total disability due to pneumoconiosis by showing that he was employed for fifteen or more years in the coal mines and "if other evidence [than a chest X-ray] demonstrates the existence of a totally disabling respiratory or pulmonary impairment . . . ." 30 U.S.C. § 921(c)(4). The Secretary may rebut this presumption only by showing either that the miner does not have pneumoconiosis or that his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine. *Id.*

Charles E. Bozwich ("claimant") is now 77 years old. In July, 1970, claimant filed an application for black lung disability benefits under the Federal Coal Mine Health and Safety Act of 1969. His application was denied and upon his request for reconsideration, the denial was affirmed. After the Act was amended in 1972, his claim was re-examined and again denied. He then requested a hearing before an Administrative Law Judge (ALJ). The hearing was held on March 25, 1974.

### I

The evidence adduced at the hearing may be summarized as follows. Claimant testified that he was born on September 11, 1899. He has two and one-half years of formal education. From 1911 until 1931 claimant was employed as a coal miner in Appanoose County, Iowa. From 1931 until 1943 he was the co-owner and operator of a small coal mine. From 1943 until 1969 he owned and operated a tavern in Mystic, Iowa. He continues to own the tavern, but he no longer works there.

Claimant testified that he left work in the coal mines because he "couldn't stand the air." An acquaintance, John W. Scott, described claimant's condition in this manner:

[H]e's awful short of wind what time I seen him walk, he's short of wind. I wouldn't say he could do anything like any ways near decent work at all.

Claimant's wife wrote a letter which contained this description of claimant's condition:

My husband had to quit working in the coal mines because of breathing conditions and other complications of the lungs. When he came home from work, he would spit up a black mucus for several hours. He had to elevate the head of his bed, because when lying down flat he would choke and cough constantly. He spent much time sitting up in a chair at night as he seems to breath[e] more easily in this position. My husband cannot do any kind of work which requires any physical exertion. He can only go up a few stairs, and then very slowly. He is under a doctor's care, and has regular check ups. He is absolutely unable to do any kind of employment.

A medical report and a request for Medicare payments prepared by Dr. A. S. Owca, a general practitioner and claimant's treating physician, were introduced in evidence. The medical report diagnosed claimant's illnesses as leg cramps, chest pain (with possible coronary insufficiency), and chronic bronchitis, and indicated that claimant was disabled and unable to work. The Medicare form listed claimant's illnesses as cervical disc disease, arthritis, and emphysema.

---

**3.** A miner may also establish the existence of complicated pneumoconiosis by X-ray, biopsy, or autopsy evidence. 20 C.F.R. § 410.418.

Such evidence creates an "irrebuttable presumption" of total disability due to pneumoconiosis. *Id.*

Dr. R. A. Hastings conducted a chest X-ray of claimant in October, 1970. The report indicated that claimant had pneumoconiosis, I.L.O. classification category 1, and Cincinnati classification 1/1, but that otherwise he had no active pulmonary disease. These same X-rays were read by two other physicians who found them completely negative of pneumoconiosis.

Dr. David O. Holman, a pathologist, submitted an evaluation of ventilatory function study tracings[4] performed on claimant. Noting claimant's height as 5 feet 8½ inches, the doctor recorded the forced expiratory volume in one second ($FEV_1$) as 2.86 liters and the maximum breathing capacity (MBC) as 95.8 liters per minute. These tracings were reviewed by Dr. H. David Kerr, who found that the tests were performed in a satisfactory manner.

## II

The ALJ considered all the above evidence and decided that claimant was not eligible for black lung benefits. The ALJ first found that claimant did not qualify under the interim criteria contained in 20 C.F.R. § 410.490. In order to qualify for benefits by virtue of ventilatory function studies, a person of claimant's height must have an $FEV_1$ of 2.4 liters or less and an MBC of 96 liters per minute or less. 20 C.F.R. § 410.490(b)(1)(ii). Claimant's MBC of 95.8 liters per minute was within the specified range but his $FEV_1$ of 2.86 liters did not fall within the interim limits.

The ALJ then considered whether claimant could qualify under the permanent criteria. The only way claimant could qualify would be to rely on the presumption of 30 U.S.C. § 921(c)(4) which arises on a showing of fifteen years work in the coal mines and the existence of totally disabling respiratory or pulmonary impairment. The ALJ found that the preponderance of the evidence did not demonstrate the existence of a totally disabling respiratory or pulmonary

disease. This finding was based on Social Security Ruling 73–37, which states that when X-ray and ventilatory test findings do not meet the requirements of the interim criteria, there is an "inference" that the claimant is not totally disabled. The ALJ found that Dr. Owca's diagnosis of chronic bronchitis was "not sufficient to overcome the inference that the claimant is not totally disabled."

The Appeals Council adopted the ALJ's decision and it thus became the final decision of the Secretary. Claimant filed a petition to review the Secretary's decision in the District Court and both parties moved for summary judgment. After a hearing, the District Court granted summary judgment in favor of claimant.

The District Court found that substantial evidence supported the Secretary's determination that claimant did not qualify for benefits under the interim criteria. However, the Court found that the Secretary erred in finding that claimant did not qualify for benefits under the permanent criteria by virtue of the § 921(c)(4) presumption. The Court said that the Secretary's reliance on an inference of non-disability based on negative chest X-rays and ventilatory test results was incorrect because it resulted in a "premature" weighing of the evidence. The Court reviewed the evidence, found that it was sufficient to establish the presumption of total disability due to pneumoconiosis, and found that the Secretary did not rebut the presumption.

## III

After the passage of the Federal Coal Mine Health and Safety Act of 1969, it became increasingly apparent that large numbers of miners who suffered from serious respiratory and pulmonary problems as a result of their employment in the coal mines were being denied black lung benefits. In the three years following passage of the 1969 Act, almost 50% of disability

---

4. These tracings are the result of a test which requires the subject to inhale and exhale as hard as he can. The extent of obstruction of the airway is measured by maximum breathing capacity (MBC), also known as maximum voluntary ventilation (MVV), and the forced expiration volume (FEV). [1972] U.S.Code Cong. & Admin.News, *supra,* at p. 2319.

claims were denied. S.Rep. No. 743, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 2305, 2307.

The most significant reason for this large number of denials was the miners' failure to present X-ray evidence of pneumoconiosis. *Id.* at p. 2313. The problem was that X-ray evidence is far from conclusive evidence of the presence or absence of pneumoconiosis. A Public Health Service survey indicated that in 25% of all cases where the X-ray was negative, subsequent autopsies revealed that the miner was actually afflicted with pneumoconiosis. *Id.* at pp. 2314, 2316. There was also testimony to the effect that an X-ray might be so clouded with emphysema that pneumoconiosis would not be revealed. *Id.* at p. 2314. Moreover, studies indicated that coal miners suffer proportionately higher rates of other respiratory diseases than do members of the general public. *Id.*

In the 1972 Act, Congress took a number of steps to combat this often insurmountable problem of proving eligibility for benefits. Two of these steps are important to this case.

First, Congress enacted 30 U.S.C. § 921(c)(4), which provides that a miner raises a rebuttable presumption that he is totally disabled due to pneumoconiosis if he can show that he was employed as a coal miner for at least fifteen years and that he suffers from a totally disabling pulmonary or respiratory impairment.

Second, Congress mandated that, in determining the validity of claims for black lung benefits, the Secretary shall consider all relevant evidence, including:

> medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.

30 U.S.C. § 923(b).

■ The legislative history of the 1972 Act clearly shows that Congress intended the 1972 Act to be liberally construed in favor of the miners to insure compensation in worthy cases despite the extreme difficulty of proving the existence of pneumoconiosis by clinically certain medical evidence. The Senate Report states:

> The Black Lung Benefits Act of 1972 is intended to be a remedial law—to improve upon the 1969 provisions so that the cases which should be compensated, will be compensated. In the absence of definitive medical conclusions there is a clear need to resolve doubts in favor of the disabled miner or his survivors.

[1972] U.S.Code Cong. & Admin.News, *supra,* at p. 2315.

The Report also recognized the fallibility of existing medical tests for pneumoconiosis:

> The art of medical diagnosis of coal miners' respiratory impairments is not so precise that a miner's benefit should stand or fall on the basis of a single test. Every available medical tool should be used to assist a miner in successfully pursuing his claim for benefits.

*Id.* at p. 2319.

It is against this legislative background that we must determine the validity of the Secretary's decision in the instant case.

## IV

■ In determining that claimant does not suffer from a totally disabling respiratory or pulmonary impairment, the Secretary relied on Social Security Ruling 73–37. That Ruling states that when a claimant's X-ray and ventilatory function test results are insufficient to entitle him to benefits under the "interim criteria," there is an inference that he does not suffer from a totally disabling pulmonary or respiratory impairment and is thus not entitled to the presumption of totally disabling pneumoconiosis under 30 U.S.C. § 921(c)(4). Because this Ruling represents the Secretary's interpretation of his own regulations and the statute he is responsible for administering,

the Ruling must be sustained unless it is unreasonable. *Northern Indiana Public Service Company v. Porter County Chapter of the Izaak Walton League,* 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975); *Ehlert v. United States,* 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971). We are compelled to the conclusion that this Ruling is unreasonable because it conflicts with the clear legislative purpose in enacting the 1972 Act.

 The practical effect of this Ruling is to compel the miner to produce some unspecified quantum of evidence to "overcome" the "inference" of non-disability. It is contrary to Congress' recognition that objective medical tests are inconclusive indicators of pneumoconiosis and the intention of Congress to resolve doubts in favor of the miner absent "definitive medical conclusions." [5] Finally, it operates as a "counter-presumption" which shifts to the miner the burden of producing evidence to show some greater level of disability than would otherwise be required by the statute. What Congress has given the Secretary may not take away.

Claimant's treating physician diagnosed claimant's condition as chronic bronchitis and found claimant to be totally disabled. Claimant and his wife both submitted evidence showing that his breathing difficulties have resulted in extreme functional limitations. This evidence is sufficient to make out a *prima facie* case of a totally disabling respiratory or pulmonary impairment entitling claimant to the rebuttable presumption that such disability was due to pneumoconiosis. See *Henson v. Weinberger,* 548. F.2d 695, 698–99 (7th Cir. 1977). The negative X-ray readings and ventilatory function studies were insufficient to establish that claimant is not entitled to the presumption. *Id.* at 699.

The Secretary seeks to rebut the presumption in favor of claimant by contending that claimant's impairment did not arise out of coal mine employment. *See* 30 U.S.C. § 921(c)(4). He points to the thirty years that passed between claimant's last covered coal mine employment and his first attempt to seek medical treatment for his lung condition. The mere possibility of an intervening cause is insufficient to rebut a statutory presumption. The Secretary's findings are not supported by substantial evidence and the claimant is entitled to benefits under the Act.

The order of the District Court is affirmed.

---

5. The Ruling affords undue probative value to negative X-ray examinations, which cannot alone defeat a claim for benefits, 30 U.S.C. § 923(b), and to ventilatory function tests, which admittedly do not conclusively show the absence of a pulmonary or respiratory impairment. As the Ruling itself recognizes, ventilatory function tests demonstrate the ability to move air in and out of the lungs, but do not necessarily demonstrate the ability of the patient's lungs to transfer oxygen to his bloodstream. Social Security Ruling 37–73 at p. 4.